UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ALIKEA JOHNSON | CIVIL ACTION |
| VERSUS | NO. 18-7888 |
| AMERICAN COMMERCIAL BARGE LINE, LLC, ET AL. | SECTION A(1) |

## ORDER AND REASONS

The following motions are before the Court: **Motion for Summary Judgment (Rec. Doc. 35)** filed by Associated Terminals, LLC; **Motion for Summary Judgment (Rec. Doc. 41)** filed by J. Aron & Co., LLC; **Motion for Summary Judgment (Rec. Doc. 39)** filed by American Commercial Barge Line, LLC. Plaintiff, Alikea Johnson, has responded to all of the motions. The motions, submitted for consideration on October 2, 2019, are before the Court on the briefs without oral argument.[1]

**I.     Background**

At all times pertinent, plaintiff Alikea Johnson was employed by defendant Associated Terminals, LLC as a forklift operator. Associated is a stevedoring company with multiple facilities along the Lower Mississippi River.

This litigation derives from a work-related incident that occurred on April 30, 2018. On that day Johnson was operating a forklift inside the hold of a hopper barge, Barge MGT-0006 (at times referred to simply as "the Barge"), which was moored to an ocean-going bulk carrier, the M/V LIBERTY, midstream on the Mississippi River at Associated's Chalmette buoy. The LIBERTY contained a cargo of aluminum ingots. Johnson used his forklift to lift a

---

[1] Oral argument has been requested but the Court is not persuaded that oral argument would add anything to the parties' excellent and thorough memoranda.

load of the ingots and then attempted to place that load in a designated location inside the Barge. When doing so, the forklift fell over onto its left side which caused Johnson's lower right leg to become trapped under the front left vertical bar of the forklift's cage. Johnson contends that it was a dent/indentation/dip/hole in the surface on the Barge's floor that caused the forklift to fall over.[2]

The Barge MGT-0006 was owned by American Commercial Barge Line, LLC ("ACBL"). ACBL's business is to move its customers' freight from origin to destination. ACBL does not load or unload barges; its barges are all unmanned.

The business transaction underlying this litigation was as follows: J. Aron & Co., LLC purchased a quantity of aluminum ingots from Traxys North America, LLC. The ingots were transported to Chalmette, Louisiana on the LIBERTY. In the spring of 2018, Traxys retained Associated to offload for transportation the ingots that J. Aron had purchased. Multiple barges were needed to perform the offloading operation. J. Aron retained ACBL (pursuant to a pre-existing Contract of Affreightment between those parties) to provide cargo barges and to pilot them to their ultimate destination once loaded. The ultimate destination was in Little Rock, Arkansas to a customer to which J. Aron had resold (or would resell) the aluminum ingots.

The litigation began when Johnson filed suit against ACBL in state court. ACBL removed the case and Johnson later brought J. Aron and Associated in as additional defendants.

---

[2] In his opposition Johnson describes the hazard as an indentation in the center of the Barge's floor measuring 8 feet long x 11.25 feet wide and 6 to 7 inches deep. (Rec. Doc. 48 at 3).

As to Associated, who was Johnson's employer, Johnson alleges that he is a Jones Act seaman, and alternatively that Associated is liable for vessel negligence under § 905(b) of the LHWCA.[3]

As to J. Aron, the shipper, Johnson contends that it exercised sufficient dominion and control over the Barge MGT-0006 to be deemed its owner pro hac vice and therefore subject to liability for vessel negligence. Should the Court determine that J. Aron was not an owner pro hac vice of the Barge MGT-0006 (and therefore not subject to a claim for vessel negligence), Johnson contends that J. Aron is liable under general maritime law for its own negligence.

As to ACBL, the vessel owner, Johnson contends that as owner of the defective barge, ACBL is liable for vessel negligence for violating the turnover duty and the duty to intervene.[4]

This is a nonjury case. At this time the case is not scheduled for trial.[5]

All defendants now move for summary judgment. The Court addresses each of their motions in turn.

---

[3] Johnson began receiving LHWCA benefits following the incident based on his status as a longshoreman. The benefits carrier ceased paying benefits when Johnson brought a Jones Act claim against Associated. Johnson was forced to file a claim against Associated with the United States Department of Labor in order to have his LHWCA benefits reinstated during the pendency of this litigation. (Rec. Doc. 35-5, Pla. Exhibit B).

[4] The vessel owner's duties to a longshoreman per *Scindia Steam Navigation Co. v. Santos*, 451 U.S. 156 (1981), are the turnover duty, the active control duty, and the duty to intervene. *Howlett v. Birkdale Ship. Co.*, 512 U.S. 92, 97-98 (1994). These same duties are imposed on an owner pro hac vice.

[5] The nonjury trial in this matter was scheduled to commence on November 12, 2019. On October 21, 2019, the Court cancelled the trial in light of the number of pending dispositive motions. (Rec. Doc. 64).

## II. Discussion

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-movant, "show that there is no genuine issue as to any material fact." *TIG Ins. Co. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir.2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.). The court must draw all justifiable inferences in favor of the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505). Once the moving party has initially shown "that there is an absence of evidence to support the non-moving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the non-movant must come forward with "specific facts" showing a genuine factual issue for trial. *Id.* (citing Fed.R.Civ.P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial. *Id.* (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir.1993)).

In bench trial cases the district judge has greater discretion to grant summary judgment. *Jones v. United States*, 936 F.3d 318, 323 (5th Cir. 2019). The district judge may "decide that the same evidence, presented to him or her as a trier of fact in a plenary trial, could not possibly lead to a different result." *Id.* (quoting *Johnson v. Diversicare Afton Oaks, LLC*, 597 F.3d 673, 676 (5th Cir. 2010)).

### 1. *Associated Terminals, LLC*

Associated moves for summary judgment arguing that Johnson is not a Jones Act seaman and that Associated cannot be held liable on Johnson's alternative claim for vessel negligence because it was not the owner pro hac vice of the Barge MGT-0006.[6]

Regarding the Jones Act claim, Associated argues that Johnson cannot establish seaman status because he lacks the requisite connection to a vessel in navigation. *See Chandris, Inc. v. Latsis*, 515 U.S. 347 (1995) (clarifying the requirements for seaman status). In response to this aspect of Associated's motion, Johnson acknowledges that at this time (all discovery is complete) he lacks the evidence necessary to prevail on seaman status. Although he does not voluntarily concede that he was not a seaman, he advises that he will not offer any opposition to Associated's motion insofar as it challenges seaman status. (Rec. Doc. 49, Opposition at 2, 11-12).

Associated's motion for summary judgment will be granted as to the Jones Act claim and as to any claims asserted against Associated under general maritime law that are premised on seaman status. As to all defendants, Johnson will be treated as a longshoreman from this point forward.

Even if his status is that of a longshoreman, Johnson argues that Associated should not be completely dismissed from the case because there are genuine issues of material fact regarding whether Associated was the owner pro hac vice of the Barge MGT-0006.

The LHWCA provides for two different types of liability—a worker may receive compensation benefits from his employer without regard to fault and the same worker may pursue a tort action against the vessel for acts of vessel negligence. *Levene v. Pintail*

---

[6] It is undisputed that Associated was not the actual owner of the Barge MGT-0006. Rather, ACBL was the Barge's actual owner.

*Enters., Inc.*, 943 F.2d 528, 531 (5th Cir. 1991) (citing 33 U.S.C. §§ 904, 905(b)). Although the LHWCA affords an employer full immunity from tort suits by its employees, when a longshoreman is injured on a vessel owned by his employer (in other words, when the employer acts in a dual capacity as vessel owner), the employer may be sued for acts of vessel negligence. *Id.* (citing *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 532 (1983); *Kerr-McGee Corp. v. Ma-Ju Marine Serv., Inc.*, 830 F.2d 1332, 1339 (5th Cir. 1987)). Even in a dual capacity situation the employer retains its immunity for acts taken in its capacity as an employer so the difference between the capacities in which an employer may act is extremely important. *Id.* For purposes of the vessel negligence cause of action allowed by § 905(b), "vessel" includes an owner pro hac vice. 33 U.S.C. § 902(21); *Ducote v. Int'l Oper. Co. of La., Inc.*, 678 F.2d 543, 544 n.1 (5th Cir. 1982).

For owner pro hac vice status to attach, it is generally necessary for the defendant's relationship to the vessel to be analogous to that of a bareboat charterer, which is materially different from that of a stevedore to a vessel. *Bossard v. Port Allen Marine Serv., Inc.*, 624 F.2d 671, 672 (5th Cir. 1980) (citing *Rao v. Hillman Barge & Constr. Co.*, 467 F.2d 1276, 1277 (3rd Cir. 1972)). Under a bareboat charter, the full possession and control of the vessel is transferred to the charterer. *Walker v. Braus*, 995 F.2d 77, 81 (5th Cir. 1993). A bareboat charter requires the "complete transfer of possession, command, and navigation of the vessel" from the owner to the charterer. *Agrico Chem. Co. v. M/V BEN W. MARTIN*, 664 F.2d 85, 91 (5th Cir. 1981) (citing *Gaspard v. Diamond M. Drilling Co.*, 593 F.2d 605, 606 (5th Cir. 1979)). This type of arrangement is "tantamount to, though just short of, an outright transfer of ownership." *Id.* (quoting *Guzman v. Pichirilo*, 396 U.S. 698, 700 (1962)).

In support of his contention that Associated became the owner pro hac vice of the Barge MGT-0006, Johnson points out that only Associated's employees were physically

onboard the Barge once it was delivered alongside the LIBERTY for loading. Johnson also points out that Associated's personnel did not properly inspect the Barge prior to the commencement of loading to ensure that the vessel was safe.

The custody and control that Associated's employees had over the Barge MGT-0006 during stevedoring operations was limited to that which was necessary to carry out cargo operations pursuant to the stevedoring contract with Traxys. Associated had no right to use the vessel for any purpose of its own, to move, moor, or unmoor the vessel, or to remain on the vessel once the cargo was loaded. When movement of the barges was necessary, ACBL used its own tugs and personnel to do so. Associated never had operational control of the Barge. To the extent that Associated exercised control over the Barge MGT-0006, that control did not go beyond that which was incident to carrying out its stevedoring operations.

Simply, the control that Associated exercised or had the right to exercise over the Barge was not analogous to the type of exclusive and plenary control attendant to a bareboat charter. If Johnson's position were adopted then every stevedore conducting cargo loading on an otherwise unmanned barge would become an owner pro hac vice subject to a claim for vessel negligence by its employees. This is not what the LHWCA envisions.

Further, even if Associated's personnel failed to properly inspect the Barge prior to stevedoring operations, this omission would have taken place in its capacity as a stevedore (Johnson's employer), not as a vessel owner. Therefore, this omission would not constitute vessel negligence for which Associated could be liable to Johnson.

In sum, Johnson's exclusive remedy against Associated is for benefits under the LHWCA. Associated is entitled to judgment as a matter of law on all of Johnson's claims asserted in this action. Associated's motion for summary judgment is granted.

### 2. J. Aron & Co., LLC

J. Aron moves for summary judgment arguing that it was not an owner pro hac vice of the Barge MGT-0006 and therefore cannot be held liable for vessel negligence. Even if J. Aron were found to be an owner pro hac vice of the barge, and therefore subject to a claim by Johnson for vessel negligence, J. Aron argues that the *Scindia* turnover duty was not violated in this case because the problem with the Barge's floor was open and obvious.[7]

The requirements for owner pro hac vice status are laid out in the section above addressing Associated's motion for summary judgment. Johnson's contention is that the Contract of Affreightment ("COA") pursuant to which J. Aron retained ACBL to transport the aluminum ingots from Chalmette to Little Rock, Arkansas was in substance a bareboat charter agreement. Johnson argues that the COA gave J. Aron the right to use the barges for its own commercial purposes in maritime commerce. According to Johnson, the COA empowered J. Aron with such dominion and managerial control over the Barge MGT-0006 that it was essentially in complete control of the barge.

It is undisputed that no one from J. Aron was onsite or anywhere near the LIBERTY or Barge MGT-0006 during the cargo operations at issue. J. Aron did monitor or keep abreast of the arrival/departure dates for its cargo and the progress of the offloading

---

[7] Neither the active control duty nor the duty to intervene could apply to J. Aron because J. Aron had no employees or representatives physically present on the Barge at any time. Moreover, the failure to warn aspect of the turnover duty could not apply to J. Aron because there is no evidence that anyone with J. Aron knew which specific barges ACBL would supply from its fleet much less that the Barge MGT-0006 had a defect in its floor. As J. Aron has pointed out, J. Aron is the only party in this lawsuit that had no knowledge of the Barge MGT-0006's condition.

operation but there is no evidence that anyone from J. Aron directed from afar the operation of the barges. J. Aron, as shipper, did determine the maximum tonnage per barge but the discharge instructions were directed at the stevedores and do not evince the ability to control the barges operationally. (Rec. Doc. 47-7, Pla. Exhibit D).

In fact, the terms of the COA foreclose the conclusion that J. Aron had any operational control over ACBL's barges whatsoever much less that level of operational control like that of a bareboat charterer. Paragraph 5 of the COA reserves to ACBL the right to give J. Aron instructions regarding height of load, weight of load, draft of barge and "such other instructions as ACBL may deem desirable for safe transportation." (Rec. Doc. 47-6, Pla. Exhibit C at 3). The COA also reserves to ACBL "at its exclusive option" the right to refuse to transport the barges as loaded and to force the shipper at its own expense to redistribute the cargo if ACBL requires that. (*Id.*). Paragraph 14 of the COA restricts the type of cargo that J. Aron can place on ACBL's barges. And Paragraph 11 of the COA expressly reserves to ACBL the right to move the barges at its own convenience, to shift the tow as it deems necessary, and to deviate from its normal route and to call at any port that ACBL chooses while in transit. (*Id.* at 4). J. Aron was not allowed to re-consign and/or stop off the barges without ACBL's consent. (*Id.* at 4 ¶ 12). All of these provisions evince the significant control that ACBL retained over its barges at all times and they are inconsistent with the type of complete dominion and control that transfers from a vessel owner to a bona fide bareboat charterer.

Johnson relies heavily on Paragraph 8 of the COA which states that the shipper "shall be deemed to be in possession" of the barges once they are delivered to the shipper's designated location. (*Id.* at 4). This provision is important from ACBL's perspective to establish when the barges are on the clock for day rates (regardless of the status of cargo

operations) and for purposes of shifting liability for damage after the barges are placed at the designated loading point but it does not establish a complete transfer of operational control of the barges to J. Aron. It is clear that once ACBL delivered the barges and left them at the Chalmette buoy awaiting retrieval that J. Aron became completely responsible for them just as if it had actual physical possession of them. But J. Aron had no right to move the barges without ACBL's consent. And even during the period of stevedoring operations when the barges were deemed to be in J. Aron's possession, J. Aron's cargo activities remained constrained by Paragraphs 5 and 14 of the COA. The COA is a contract for the carriage of cargo and its terms make clear that J. Aron did not obtain an "ownership type" relationship with ACBL's barges. J. Aron was not an owner pro hac vice of the Barge MGT-0006.

Given that J. Aron was not an owner pro hac vice of the Barge MGT-0006, Johnson has not established that J. Aron, as shipper, breached any duty owed to Johnson under maritime law. J. Aron was required under the COA to inspect the barges upon delivery for the purpose of determining whether ACBL had provided vessels suitable for the intended cargo. (Rec. Doc. 47-6 at 4). The purpose of the contractually-required inspection was to determine if the shipper had reason to request that ACBL provide a more suitable barge for the use that J. Aron intended. The purpose of the inspection was not to look for hazards in the barges that might present challenges to the stevedores. The Court discerns nothing that J. Aron did or failed to do that injured Johnson.[8]

In sum, J. Aron is entitled to judgment as a matter of law on all of Johnson's claims asserted in this action. J. Aron's motion for summary judgment is granted.

---

[8] As J. Aron has pointed out, the only aspect of the operation that it dictated was the max tonnage per barge but this did not play a role in Johnson's accident.

### 3. *American Commercial Barge Line, LLC ("ACBL")*

Johnson contends that as owner of the defective barge, ACBL violated at least two of the *Scindia* duties—the turnover duty and the duty to intervene.

The turnover duty applies to the shipowner's obligation before or at the commencement of the stevedore's activities. *Kirksey v. Tonghai Maritime*, 535 F.3d 388, 392 (5th Cir. 2008). This duty places two responsibilities on the vessel owner. First, the vessel owner owes a duty to exercise ordinary care under the circumstances to turn over the ship and its equipment in such condition that an expert stevedore can carry on stevedoring operations with reasonable safety. *Id.* (citing *Fed. Marine Terms., Inc. v. Burnside Shipp. Co.*, 394 U.S. 404, 416-17 & n.18 (1969)). Second, the owner owes a duty to warn the stevedore of latent or hidden dangers which are known to the vessel owner or should have been known to it. *Id.* (citing *Howlett*, 512 U.S. at 99-100). The duty to warn is narrow insofar as it does not include dangers that are either open and obvious or dangers that a reasonably competent stevedore should anticipate encountering. *Id.*

An exception to the turnover duty applies if the defect causing the injury is open and obvious and one that the longshoreman should have seen. *Moore v. M/V ANGELA*, 353 F.3d 376, 381 (5th Cir. 2003) (citing *Scindia*, 451 U.S. at 167; *Pimental v. LTD Canadian Pac. Bul*, 965 F.2d 13, 16 (5th Cir. 1992)). The exception does not apply, however, if the longshoreman's only alternatives to facing the hazard are unduly impracticable or time-consuming or would force him to leave the job. *Id.* (citing *Pimental*, 965 F.2d at 16; *Treadaway v. Societe Anon. Louis-Dreyfus*, 894 F.2d 161, 167 (5th Cir. 1990); *Teply v. Mobil Oil Corp.*, 859 F.2d 375, 378 (5th Cir. 1988)).

The duty to intervene arises when a vessel has actual knowledge of a dangerous condition and actual knowledge that the stevedore in the exercise of "obviously improvident"

judgment has failed to remedy it. *Pimental*, 965 F.2d at 17 (citing *Randolph v. Laeisz*, 896 F.2d 964, 970 (5th Cir. 1990); *Woods v. Sammisa Co.*, 873 F.2d 842, 854 (5th Cir. 1989); *Helaire v. Mobil Oil Co.*, 709 F.2d 1031, 1037 (5th Cir. 1983)).

Under the LHWCA a longshoreman cannot sue a vessel owner for the unseaworthiness of its vessel. *See* 33 U.S.C. § 905(b). Congress in § 905(b) replaced the unseaworthiness cause of action against a vessel with liability based on negligence. *Levene*, 943 F.2d at 533.

ACBL knew about the indentation in the barge's floor no later than April 5, 2016. (Rec. Doc. 48-8, Pla. Exhibit 8). ACBL's maintenance personnel had inspected the Barge but determined that the indentation did not prevent the Barge from remaining in service and was not significant enough to require a repair. (Rec. Doc. 39-20, Masters deposition at 102). The Barge Summary Excerpts for Barge MGT-0006 indicate that the Barge continued in service after the dent was noted in 2016. No evidence has been presented to suggest that the dent caused any person to suffer injuries during cargo operations until Johnson's accident on April 30, 2018.

Even though the floor of a hopper barge is never as smooth as a table top and generally has uneven or wavy points given the abuse by heavy equipment and cargo, (*id.* at 75), this particular indentation was more significant than what a stevedore would typically encounter during cargo operations. (Rec. Doc. 48-9, Johnson Deposition at 135).

Johnson noticed the dent the first day that he entered the cargo hold of Barge MGT-0006 and he reported it to "them" at that time.[9] (*Id.* at 140). Johnson did not believe,

---

[9] It is not clear to whom Johnson spoke to at this point when he first entered the barge's hold before the cargo loading began. But Johnson never spoke with anyone from ACBL or J. Aron so it had to have been someone with Associated.

however, at this point that it would be dangerous to drive over the dent; it was not until he loaded his forklift with cargo that he realized that he had a problem. (*Id.* at 141). Johnson had no choice but to traverse the indentation during the cargo operations. Realizing that he had a problem he reported it to the Associated foreman and the Associated superintendent—both of whom were on the LIBERTY dealing with cargo problems at that end of the operation. Neither of those superiors came down into the barge hold to inspect the dent in person.

Jerry Johns, the Associated superintendent, did call Kenny Arnold, a more experienced and knowledgeable stevedore and forklift operator, who was sent in to inspect the dip in the barge surface and to offer his opinion regarding Johnson's concerns. Johns says that Arnold told him that he did not believe it was an issue and that they could continue operations. (Rec. Doc. 47-13, Pla. Exhibit J at 3). Before the accident Johns went to the deck of the LIBERTY and looked down into the barge's hold to observe Johnson operate the forklift for 15 to 20 minutes without problems in the area of the dent. (Rec. Doc. 39-18, Johns deposition at 52). Johns told Johnson that when driving through the indentation to be sure to keep his loads close to the floor, which is normal procedure. (*Id.* at 50). Johns testified that when he observed Johnson operate the forklift before the accident Johnson had the load 6 to 8 inches from the ground. (Rec. Doc. 39-18, Johns deposition at 52).

It is clear from his deposition testimony that Johnson believed that the Associated supervisors were ignoring his concerns about the indentation. Johnson mentioned several times during his deposition that their reaction to his concerns was simply that he should just go back to work. (Rec. Doc. 48-9, Johnson deposition at 141-42, 152-53). For this reason Johnson went so far as to have a coworker use a cell phone to make a video of him operating the forklift in the area of the dent to demonstrate the safety problems with

continuing to work around the dent. (ACBL Exhibit 7 (manual)). Johnson did not send the video to anyone before the accident.

Johnson could not complete the cargo loading without traversing the dent at some point. Although the efficacy of doing something like placing steel sheets over the indentation is debatable, everyone with expertise in forklift operations who opined on the matter agreed that the key to safely operating a loaded forklift through something like the indentation was in keeping the loads low to the ground. Raising the forklift's load raises its center of gravity and makes it particularly susceptible to tipping over when working on an uneven surface. At the time of the accident Johnson had the cargo raised at its maximum height of 10 to 12 feet.

Johnson does not deny that the load was at its maximum height when the forklift fell over but Johnson has stated that he had no choice but to maneuver with the load high in order to clear the already stacked cargo. (Rec. Doc. 48-9, Johnson deposition at 156). The Court is persuaded that there are issues of material fact regarding whether and to what extent Johnson contributed to his own injuries given the manner in which he was operating his forklift at the time of the accident.

At no time did ACBL have personnel aboard the barge who could have intervened in the stevedores' operations. Therefore, ACBL did not violate the duty to intervene. Further, because Johnson and all of his supervisors knew about the indentation before the accident occurred, it is immaterial that ACBL did not warn Johnson about the dent before operations began. ACBL did not violate the warning aspect of the turnover duty.

ACBL's responsibility under the turnover duty to exercise ordinary care under the circumstances to turn over the ship and its equipment in such condition that an expert stevedore can carry on stevedoring operations with reasonable safety presents a more

difficult question. The Court declines to determine on summary judgment whether ACBL violated this aspect of the turnover duty. Under the law, ACBL cannot be liable for a condition in its barge that might have rendered it unseaworthy. ACBL can only be liable for its own negligence. While it is beyond cavil that the indentation was an open and obvious defect, the Court is persuaded that Johnson should be allowed to try his case as to his contention that the exception to the open and obvious defense applies.

In sum, ACBL's motion for summary judgment is granted in part and denied in part as explained above.

## III. Conclusion

Associated Terminals, LLC and J. Aron & Co., LLC are entitled to judgment as a matter of law on all claims. ACBL is entitled to judgment as a matter of law on Johnson's turnover duty to warn claim and on his duty to intervene claim. Summary judgment is denied on the issue of whether ACBL breached its duty to exercise ordinary care under the circumstances to turn over a barge in such condition that an expert stevedore could carry on stevedoring operations with reasonable safety.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 35)** filed by Associated Terminals, LLC is **GRANTED**.

**IT IS FURTHER ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 41)** filed by J. Aron & Co., LLC is **GRANTED**.

**IT IS FURTHER ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 39)** filed by American Commercial Barge Line, LLC is **GRANTED IN PART AND DENIED IN PART** as explained above.

**IT IS FURTHER ORDERED** that a status conference with the Court is set for **Thursday, January 16, 2020, at 10:00 a.m.** for the purpose of selecting new trial and pretrial conference dates. <u>This status conference will take place in chambers</u>.

December 20, 2019

_____
JUDGE JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE